| Pay Period Ending | Scheduled Hours | Total Hours | Overtime Hours - Not Premium | Overtime Hours - Not Paid At All | Regular Rate | Overtime Rate | Total Owed |
|---|---|---|---|---|---|---|---|
| 10/24/98 | 48 | 54.5 | 8 | 6.5 | $19.62 | $29.42 | $269.63 |
| 10/31/98 | 48 | 64.5 | 8 | 16.5 | $19.62 | $29.42 | $563.83 |
| 11/7/98 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 11/14/98 | 48 | 61.5 | 8 | 13.5 | $19.62 | $29.42 | $475.57 |
| 11/21/98 | 48 | 62.5 | 8 | 14.5 | $19.62 | $29.42 | $504.99 |
| 11/28/98 | 48 | 62.25 | 8 | 14.25 | $19.62 | $29.42 | $497.64 |
| 12/5/98 | 48 | 62.25 | 8 | 14.25 | $19.62 | $29.42 | $497.64 |
| 12/12/98 | 48 | 10.25 | 0 | 0 | $19.62 | $29.42 | $0.00 |
| 12/19/98 | 48 | 62 | 8 | 14 | $19.62 | $29.42 | $490.28 |
| 12/26/98 | 48 | 52 | 8 | 4 | $19.62 | $29.42 | $196.08 |
| 1/2/99 | 48 | 73 | 8 | 25 | $19.62 | $29.42 | $813.90 |
| 1/9/99 | 48 | 52.25 | 8 | 4.25 | $19.62 | $29.42 | $203.44 |
| 1/16/99 | 48 | 66.5 | 8 | 18.5 | $19.62 | $29.42 | $622.67 |
| 1/23/99 | 48 | 54.75 | 8 | 6.75 | $19.62 | $29.42 | $276.99 |
| 1/30/99 | 48 | 65.75 | 8 | 17.75 | $19.62 | $29.42 | $600.61 |
| 2/6/99 | 48 | 62.75 | 8 | 14.75 | $19.62 | $29.42 | $512.35 |
| 2/13/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 2/20/99 | 48 | 64.5 | 8 | 16.5 | $19.62 | $29.42 | $563.83 |
| 2/27/99 | 48 | 65.25 | 8 | 17.25 | $19.62 | $29.42 | $585.90 |
| 3/6/99 | 48 | 0 | 0 | 0 | $19.62 | $29.42 | $0.00 |
| 3/13/99 | 48 | 21.75 | 0 | 0 | $19.62 | $29.42 | $0.00 |
| 3/20/99 | 48 | 62.25 | 8 | 14.25 | $19.62 | $29.42 | $497.64 |
| 3/27/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 4/3/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 4/10/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 4/17/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 4/24/99 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $549.12 |
| 5/1/99 | 48 | 51.5 | 8 | 3.5 | $19.62 | $29.42 | $181.37 |
| 5/8/99 | 48 | 63.25 | 8 | 15.25 | $19.62 | $29.42 | $527.06 |
| 5/15/99 | 48 | 46.75 | 6.75 | 0 | $19.62 | $29.42 | $66.15 |
| 5/22/99 | 48 | 11 | 0 | 0 | $19.62 | $29.42 | $0.00 |
| 5/29/99 | 48 | 21.75 | 0 | 0 | $19.62 | $29.42 | $0.00 |
| 6/5/99 | 48 | 46.25 | 6.25 | 0 | $19.62 | $29.42 | $61.25 |
| 6/12/99 | 48 | 56.5 | 8 | 8.5 | $19.62 | $29.42 | $328.47 |
| 6/19/99 | 48 | 49 | 8 | 1 | $19.62 | $29.42 | $107.82 |
| | | | | | | TOTAL: | $13,288.91 |

F.D. IMPORT & EXPORT
CORP., Plaintiff,

v.

M/V REEFER SUN, Her engines, tackle, boilers, equipment and furnishings, Arctic Reefers, Corp. (or Ltd.), Bright Sapphire Maritime, Inc., Oesterreichischer Lloyd Ship Management Ges MBH, Exportadora Banenera Noboa, South Pacific Shipping Co. Ltd., Pacific Fruit Co., Italy SpA, and Frutera

Jambeli Frujasa C.A., Grupo Noboa,
Defendants.

No. 02 Civ. 2936(SAS).

United States District Court,
S.D. New York.

Dec. 4, 2002.

Victor Roger Rubin, International Law Counsel, P.C., New York, NY, for Plaintiff.

John R. Keough, III, Waesche, Sheinbaum & O'Regan, P.C., New York, NY, Garth S. Wolfson, Mahoney & Keane, New York, NY, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

F.D. Import & Export Corp. ("F.D.Import") brings this admiralty and maritime action to recover damages for cargo shipped from South America to Europe. Plaintiff claims that: (1) the supplier of the cargo breached the Purchase Agreement and (2) the carrier of the cargo breached the Charter Party and Bills of Lading.[1]

---

1. F.D. Import also alleges in the Complaint that Defendants violated the Carriage of Goods by Sea Act ("COGSA"). However, this statute applies to "the carriage of goods by sea to or from ports of the United States." 46 U.S.C. § 1300 (2001). Both parties acknowledge that the goods in this case were sent directly from Ecuador to Ukraine. Since filing the complaint, F.D. Import has stated that COGSA does not apply in this case. *See* 9/18/02 Letter to the Court from Victor Rubin

Defendants now move to dismiss the action, or in the alternative, stay these proceedings, pending arbitration.

## I. BACKGROUND

### A. The Parties

F.D. Import is a New York corporation that engages in international trade. *See* Complaint ("Compl.") ¶ 4. Defendants Arctic Reefers Corp. ("Arctic Reefers"), Bright Sapphire Maritime, Inc. ("Sapphire"), Oesterreichischer Lloyd Ship Management GES MBH ("OLSM"), South Pacific Shipping Co., Ltd. ("South Pacific"), and the vessel, M/V Reefer Sun ("Reefer Sun") are all foreign entities with places of business in Bermuda, Austria, Panama, Denmark, or New York. *Id.* ¶ 5. Each entity engages in the common carriage of cargo between international ports. *Id.* ¶ 9.

Exportadora Bananera Noboa ("EBN"), Frutera Jambeli Frujasa C.A. ("Frutera"), and Grupo Noboa[2] are all foreign entities with offices in New York. *Id.* ¶ 7 Pacific Fruit Co., Italy SpA ("Pacific Fruit"), is a foreign entity with offices located in Italy and Ecuador. *Id.* These entities supply fruit for international trade. *Id.* ¶¶ 7, 10.

### B. Factual Background

This case involves a shipment of bananas from Guayaquil, Ecuador to Nikolaev, Ukraine. *Id.* ¶ 4. In 2001, F.D. Import arranged the shipment of bananas to its affiliate and customer located in Ukraine—Avrora, Inc. *Id.* ¶ 11. F.D. Import had an oral agreement for the purchase of bananas from Pacific Fruit, a banana supplier. *Id.*

On March 19, 2001, a Charter Party was executed for the shipment of the bananas on the vessel Reefer Sun, a ship owned and operated by Arctic Reefers. *Id.* ¶ 9. The only signatories to the Charter Party were Arctic Reefers and the charterer—South Pacific. *See* 3/19/01 Charter Party Agreement between Arctic Reefers and South Pacific ("Charter Party") at 1. Pursuant to Clause 27 of the Charter Party, "[a]ll disputes arising under this Charter Party [are] to be referred to arbitration in London (English Law to apply)." *Id.* at Clause 27.

Six clean Bills of Lading for the shipment of the bananas were executed on March 28, 2001. *Id.* ¶ 13. According to the Bills of Lading, fresh green Ecuadorian bananas were loaded onto the Reefer Sun in Ecuador and were to be discharged in Ukraine. *Id.* On the Bills of Lading, the shipper is named as Frutera, "on behalf of: F.D. Import." Bills of Lading, Ex. B to Compl., at 1. Avrora is named as the consignee. Compl. ¶ 13. Paragraph 1 of the Conditions of Carriage located on the reverse side of the Bills of Lading, provides that "[a]ll terms and conditions, liberties and exceptions of the Charter Party ... including the Law and Arbitration Clause are herewith incorporated." 3/19/02 Bill of Lading Conditions of Carriage ("Conditions of Carriage").

On March 28, 2001, the Reefer Sun received 200,354 bananas in Ecuador, allegedly in good condition per the Bills of Lading, and the bananas were shipped to Ukraine. Compl. ¶ 18. Although F.D. Import had an oral understanding with Frutera regarding the purchase of ba-

---

("9/18/02 Pl. Letter") at 2. As a result, the COGSA claim is dismissed.

2. Plaintiff and Defendants dispute the role of Grupo Noboa in this action. Counsel for Grupo Noboa informed Plaintiff that its client should not be in this suit because it is neither

a shipper nor seller of bananas, and had no involvement with the damaged cargo. *See* 7/19/02 Letter to Victor Rubin from John Keough, III at 1. Plaintiff proposed a stipulation and order dismissing all claims against Grupo Noboa, but the parties have not agreed on the terms of the stipulation.

nanas, a written Purchase Agreement was not signed until April 5, 2001. *Id.* ¶ 11 Per the agreement, F.D. Import purchased approximately 120,000 boxes of bananas from Pacific Fruit. *Id.* ¶¶ 7, 11. On April 13, the parties amended the Purchase Agreement to include an additional 80,354 boxes of bananas. *Id.* ¶ 12.

On April 18, 2001, the shipment arrived in Ukraine and unloading began. On April 24, F.D. Import made the final payment on the purchase price of $1.9 million. *Id.* ¶¶ 16–17. Upon unloading the ship, Avrora discovered that the bananas were fraudulently and intentionally packed in Bonita boxes to conceal their true brand names. *Id.* ¶ 20. Avrora also discovered that 3,672 boxes were spoiled and unsalable. *Id.* ¶ 21. Finally, on May 4, Avrora realized that 20% of all the boxes showed signs of disease. *Id.* ¶ 22. As a result, 80,000 boxes of bananas were destroyed. *Id.* ¶ 23.

F.D. Import brought this action on April 16, 2002, seeking over $980,000 in damages. *Id.* ¶ 34. F.D. Import names nine defendants who fall into one of two categories. *First,* there are the companies involved in supplying the bananas—EBN, Pacific Fruit, Frutera, and Grupo Noboa (collectively "suppliers"). *Second,* there is the vessel, the vessel's owners/operators, and the charterer—Reefer Sun, Bright Sapphire Maritime, Inc., OLSM, Arctic Reefers, South Pacific Shipping Co. (collectively "carriers"). With respect to the carriers, F.D. Import claims that they breached the Bills of Lading and Charter Party by failing to operate the vessel in the proper condition which resulted in the damaged fruit. *Id.* ¶ 27. With respect to the suppliers, plaintiff claims that they

breached the Purchase Agreement because they did not properly grow and maintain the fruit. *Id.* ¶¶ 27–34. Plaintiff seeks to hold each defendant jointly and severally liable for the damage. *Id.* ¶ 32. Arctic Reefer brings cross-claims against its co-defendants EBN, Pacific Fruit, and Frutera, seeking indemnification and/or contribution. *See* Answer of Arctic Reefer ("Arctic Reefer Answer") ¶ 32. All Defendants contend that provisions in the Charter Party and Bills of Lading require arbitration and move to dismiss these proceedings, or in the alternative, stay the proceedings pending arbitration. *See* Arctic Reefer Answer ¶ 24; Answer of South Pacific and Suppliers ("Suppliers Answer") ¶ 38; *see also* 9/30/02 Letter to the Court from John R. Keough, III ("9/30/02 Def. Letter") at 1; 8/16/02 Letter to the Court from Garth Wolfson at 1.

## II. LEGAL STANDARD

 Pursuant to the Federal Arbitration Act ("FAA"), "a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *McMahan Sec. Co. v. Forum Capital Mkts. L.P.,* 35 F.3d 82, 85 (2d Cir.1994). *See* 9 U.S.C. § 3 (2001).[3] The purpose of the FAA is to promote the enforcement of private arbitration agreements and to express a federal policy favoring arbitration as an alternative means of dispute resolution. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co.,* 189 F.3d 289, 294 (2d Cir.1999); *I.K. Berry, Inc. v. R. Boody,* No. 99 Civ. 10968, 2000 WL 218398, at *2 (S.D.N.Y. Feb.23,

---

**3.** If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under

such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. 9 U.S.C. § 3.

2000). The statute applies to certain arbitration agreements concerning interstate commerce or maritime transactions (*e.g.*, provisions in charter parties and bills of lading of water carriers). *See* 9 U.S.C. §§ 1, 2.

█ The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Genesco, Inc. v. Kakiuchi, Ltd.,* 815 F.2d 840, 844 (2d Cir.1987). If there is an arbitrable issue, a court cannot decide it.

█ To stay proceedings pending arbitration, a court must consider four factors: (1) whether the parties agreed to arbitrate, (2) the scope of the agreement, (3) if federal statutory claims are asserted, whether Congress intended those claims to be non-arbitrable,[4] and (4) if only some of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Oldroyd v. Elmira Savs. Bank, FSB,* 134 F.3d 72, 75–76 (2d Cir.1998).

## III. AGREEMENT TO ARBITRATE

█ To establish a valid arbitration agreement under the FAA, there must be evidence of a written provision in a maritime transaction or commercial contract providing that controversies arising from the contract or transaction are subject to arbitration. *See* 9 U.S.C. § 2; *Thyssen, Inc. v. M/V Markos N,* No. 97 Civ. 6181, 1999 WL 619634, at *4 (S.D.N.Y. Aug.16, 1999), *aff'd,* 310 F.3d 102 (2d Cir.2002). Although there is a strong federal presumption in favor of arbitrability, "arbitra-

tion is a matter of contract and a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). *See Thyssen,* 1999 WL 619634, at *4. In *Thyssen,* the court examined an arbitration agreement in a case involving very similar facts.

Thyssen, Inc., a steel importer, sued a vessel and its owner for damage to a shipment of steel coils. Thyssen purchased steel from a supplier, who in turn chartered a vessel to ship the cargo. A charter party, which included an arbitration clause, was signed by the charterer and the carrier. The carrier issued bills of lading to the shipper, naming Thyssen as the consignee. The bills of lading incorporated the arbitration clause from the charter party. When the vessel and its owner sought to enforce the arbitration clause, Thyssen claimed, inter alia, that the arbitration clause was not binding on non-signatories and that the defendants had waived their right to arbitrate by waiting two years before seeking arbitration. *See Thyssen,* 1999 WL 619634, at *2. The court held that the charter party's arbitration clause governed disputes between non-signatories because it was "broad" and applied to "any dispute" arising from the charter party. *Id.* at *4–5. Moreover, the court held that Thyssen was bound by the arbitration clause because it was suing under the bill of lading. *See id.* at *6. Finally, the court held that the defendants did not waive their right to arbitrate because there had not yet been litigation on any substantial issues as a result of which Thyssen could not demonstrate that it suffered any prejudice. *See id.* at *8.

---

4. The third factor is not applicable here because there are no federal statutory claims.

■ Here, F.D. Import claims that it did not agree to arbitration because it was not a signatory to the Charter Party or Bills of Lading, and had no notice of the provisions of these instruments. For the purpose of this motion, the parties concede that F.D. Import had no actual notice of the arbitration clause.[5] *See* 9/30/02 Def. Letter at 2 n. 1; 9/9/02 Letter to the Court from Garth Wolfson at 2. The issue, then, is whether an arbitration clause in a bill of lading and a charter party are enforceable if the plaintiff had no notice of these clauses. In addition, if there is an arbitration agreement, the next question is whether it has been waived. The final question is whether the claims asserted here fall within the scope of this arbitration agreement.

## A. Notice

### 1. Binding Parties Without Actual Notice

■ A party does not need actual notice to be bound by an arbitration agreement. Constructive notice is sufficient to create a binding arbitration agreement. *See Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 237 (5th Cir.1998). Consequently, an arbitration agreement can govern a party that did not sign the agreement or is not mentioned in the agreement. *See Thyssen*, 1999 WL 619634, at *4. In a related context, but not involving an arbitration clause, the Second Circuit has held that the terms of a charter party or bill of lading are usually binding on non-signatories because to do otherwise would "impose 'far too

heavy a burden on the carriers.'" *Stolt Tank Containers, Inc. v. Evergreen Marine Corp.*, 962 F.2d 276, 280 (2d Cir. 1992). In that case, the court found that a plaintiff who was not a party to the bill of lading was nevertheless bound by its terms because plaintiff had constructive notice that its shipper had an agreement with the carrier. *See id.* at 280–81.

■ "[C]ourts have 'consistently drawn a distinction between arbitration clauses specifically identifying the parties to which it applies, and a broader form of arbitration clause which does not restrict the parties.'" *See id.* (quoting *In re Southwind Shipping Co.*, 709 F.Supp. 79, 82 (S.D.N.Y.1989)). If an arbitration clause is broad, it may govern disputes of non-signatories and parties not listed in the contract. *See Thyssen*, 1999 WL 619634, at *4. A broad clause is one that states that it covers "all disputes" arising under the charter.[6] *See id.* In contrast, a narrow arbitration clause only applies to certain parties. A limited clause typically states that it governs "disputes between owners and charterers" or other specified groups. *See Import Export Steel Corp. v. Mississippi Valley Barge Line Co.*, 351 F.2d 503, 505–06 (2d Cir.1965); *Thyssen*, 1999 WL 619634, at *4. Therefore, a broad arbitration clause in a charter party is binding on those parties with constructive notice of its terms.

■ "Constructive notice can be defined, crudely, as a rule in which 'if you should have known something, you'll be held responsible for what you should have

---

5. Nevertheless, Defendants produced a document that purports to be a proposed bill of lading sent from F.D. Import to Pacific Fruit one month prior to the shipment. This bill of lading states that Pacific Fruit acts on behalf of F.D. Import and it includes an arbitration clause. *See* 9/30/02 Def. Letter at 2.

6. If the arbitration clause only allows charterers and owners to appoint arbitrators, this does not limit the scope of the clause to only these two parties. *See Thyssen*, 1999 WL 619634, at *5. Instead, it simply indicates that the charter party involved two parties at the time of drafting. *See, e.g., id.; Midland Tar Distillers v. M/T Lotos*, 362 F.Supp. 1311, 1314–15 (S.D.N.Y.1973).

known.'" *Steel Warehouse,* 141 F.3d at 237 (citation omitted). A plaintiff has constructive notice of the terms of a charter party if the terms were properly incorporated into the bill of lading. *See id.* An arbitration clause is properly incorporated where the bill of lading explicitly refers to the charter party's arbitration clause. *See Son Shipping v. De Fosse & Tanghe,* 199 F.2d 687, 688 (2d Cir.1952) ("Where terms of the charter party are, as here, expressly incorporated into the bills of lading they are a part of the contract of carriage and are binding upon those making claim for damages for the breach of the contract just as they would be if the dispute were between the charterer and the shipowner.").

### 2. F.D. Import's Lack of Actual Notice

The Charter Party does not list F.D. Import as a party to the agreement. Instead, it is signed by the charterer (South Pacific) and the ship owner (Arctic Reefers). However, the language of Clause 27 is broad, providing that "all disputes" arising under the Charter Party will be referred to arbitration in London. Because the arbitration agreement is broad, F.D. Import is bound by its terms if it had constructive notice of the terms. *See Thyssen,* 1999 WL 619634, at *4.

The Bills of Lading provided F.D. Import with constructive knowledge of the Charter Party's arbitration clause because the Bills of Lading properly incorporated the clause. *See Steel Warehouse,* 141 F.3d at 237. Paragraph 1 of the conditions of carriage on the reverse side of the Bills of Lading states that "all terms and condi-tions" of the Charter Party "including the Law and Arbitration Clause" are herewith incorporated. This is a clear incorporation of the clause and thereby gave F.D. Import constructive notice. F.D. Import was listed as a party on the Bills of Lading and its affiliate, Avrora, was a holder of the Bills of Lading. *See* Bills of Lading, Ex. B to Compl., at 1; Compl. ¶ 11.

Even if F.D. Import claims that Frutera improperly held itself out to be F.D. Import's agent and that it was never aware of any terms of the Bills of Lading, it nonetheless had constructive notice. F.D. Import is a sophisticated company and should have known that once it arranged the shipment of fruit to Avrora, a charter party and bill of lading would have been entered into by the shipper, consignee, and the vessel and this agreement would have included a forum selection clause. *See Steel Warehouse,* 141 F.3d at 237.

█ Finally, assuming, *arguendo,* that F.D. Import had no knowledge that Frutera signed the Bills of Lading on its behalf, the terms of the Bills of Lading must apply because F.D. Import is suing under that contract. In essence, F.D. Import concedes that it is a party to the contract because it alleges that it is owed a duty by the shipper and carrier. F.D. Import "cannot pick and choose among the clauses of the bills of lading, selecting those that impose duties on the vessel and impose liability while avoiding those that establish the forum where that liability is to be determined." *See Thyssen,* 1999 WL 619634, at *6.[7] Accordingly, the terms and conditions of the Bills of Lading must apply. *See All Pacific Trading, Inc. v. Ves-*

---

**7.** F.D. Import argues that it can sue under certain terms of the Bills of Lading and ignore the arbitration clause because the clause is separable from the remainder of the contract. *See* 9/18/02 Pl. Letter at 3. However, an arbitration clause is only separable when the creation of the clause itself is at issue, such as a claim of fraud in the inducement. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). F.D. Import only claims that it did not have notice of the clause or negotiate its terms, but there is no claim of fraud. Therefore, the clause is not separable.

*sel M/V Hanjin Yosu*, 7 F.3d 1427, 1432 (9th Cir.1993) ("Plaintiff's initiation of the suit constituted acceptance of the terms of the ... bills of lading."); *Kanematsu Corp. v. M/V Gretchen*, 897 F.Supp. 1314, 1317 (D.Or.1995) ("[Plaintiff's] failure to sign or expressly consent to the bill of lading is irrelevant; [Plaintiff] is bound by its terms.").

### B. Waiver

 Even if there is an arbitration agreement the clause is not enforceable if it has been waived. Pursuant to 9 U.S.C. § 3, a court is required to determine whether an applicant for a stay has waived the right to arbitrate. *See Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir.1995). Waiver is not lightly inferred. *See Thyssen*, 1999 WL 619634, at *7. "[A]ny doubts concerning whether there has been a waiver are resolved in favor of arbitration." *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir.1995). Waiver depends on factors such as: the extent of litigation that has occurred, the time elapsed from the commencement of litigation to the request for arbitration, the proximity of the trial date to the request for arbitration, and prejudice to the non-moving party. *See id.*

 Although litigation may begin before the request for arbitration, a party is only deemed to have waived arbitration if there has been litigation pertaining to "substantial issues going to the merits." *Thyssen*, 1999 WL 619634, at *8. Minor proceedings, such as the filing of original pleadings and motions prior to any significant discovery, are not considered substantial litigation. *See id.* at *8. "Although litigation of substantial material issues may amount to waiver, delay in seeking arbitration does not create waiver unless it prejudices the opposing party." *Leadertex*, 67 F.3d at 25 (citations omitted). For example, a party can wait two years from the commencement of a case to seek arbitration, but there is no waiver if the delay did not prejudice the non-moving party. *See Thyssen*, 1999 WL 619634, at *8. However, when a party waits until the "eleventh hour" to request arbitration, and this delay prejudices the opposing party, arbitration is waived. *Leadertex*, 67 F.3d at 26–27. "Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir.1993) (internal citations omitted).[8]

F.D. Import contends that Defendants have waived any rights to arbitrate this case. *See* 8/05/02 Letter to the Court from Victor Rubin at 1. However, there has not been any substantial litigation in this case. The parties have only submitted a Complaint, Answers, and letters related to this motion. No other motions have been filed and discovery has not commenced. More importantly, there was no delay between the filing of the Complaint and the request for arbitration. Defendants responded to the complaint with Answers that asserted that the claims were subject to arbitration. *See* Arctic Reefer Answer, ¶ 24; Suppliers Answer, ¶ 38; *see also Eastern Fish Co. v. South Pacific Shipping Co.*, 105 F.Supp.2d 234, 241 (S.D.N.Y.2000) (finding no delay or prejudice where "Plaintiffs were on notice that Defendants might seek arbitration as soon as Defendants raised the arbitration issue in the answer"). If there were any delay, plaintiff is not prejudiced.

---

**8.** "[P]retrial expense and delay—unfortunately inherent in litigation—without more, do not constitute prejudice sufficient to support a finding of waiver." *Leadertex*, 67 F.3d at 26.

F.D. Import was not notified of this request on the eve of trial and has not been unfairly affected, economically or otherwise. As a result, there is no waiver.

## IV. SCOPE OF ARBITRATION AGREEMENT

The final question is whether the claims at issue are within the scope of this agreement. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Genesco*, 815 F.2d at 847. When determining whether each claim is within the scope of the arbitration clause, the Court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Id.* at 846. If particular claims "touch matters" covered by the bill of lading, then those claims must be arbitrated. *See id.*

After reviewing the factual allegations in the Complaint, it is apparent that F.D. Import's claims relating to the Bills of Lading and Charter Party fall within the scope of the arbitration clause. As explained in Part III.A.1 *supra*, the language of the arbitration agreement is broad and applies to "all" issues arising under the Charter Party. F.D. Import's claim that the shipment of the bananas did not comply with the Bills of Lading and Charter Party arises out of these agreements, which provide for the shipment of bananas in satisfactory condition. *See* Bills of Lading, Ex. B to Compl., at 1; Charter Party at 1. The cross-claim brought by Arctic Reefers against EBN, South Pacific, Frutera, and Grupo Noboa are also within the scope of the arbitration agreement. If Arctic Reefers is found liable for Plaintiff's

losses, it seeks indemnification or contribution from the co-defendants. *See* Arctic Reefer Answer, ¶ 32. This cross-claim is within the scope of the arbitration clause because the claim arises from the Charter Party. Arctic Reefers is only liable to Plaintiff if it breached its obligations under the Charter Party and this breach is the only way the cross-claim would be triggered.

In contrast, Plaintiff's claims related to the planting and maintenance of the fruit are not within the scope of the arbitration clause because they do not touch matters covered under the Charter Party or Bills of Lading. These allegations concern the condition of the fruit before shipment, and the Charter Party and Bills of Lading only cover the condition of the fruit once in the carrier's possession. *See* Conditions of Carriage ("The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel....."). As a result, these claims are governed under the provisions of the Purchase Agreement and are not subject to the arbitration clause.[9]

## V. BALANCE OF PROCEEDINGS

The only remaining question is whether the Court should stay the proceedings related to the non-arbitrable issues. Under 9 U.S.C. § 3, if the claims fall within the scope of an arbitration agreement, a court *must* stay proceedings, as it has no discretion to deny the stay. *See Dean Witter Reynolds*, 470 U.S. at 218, 105 S.Ct. 1238; *Genesco*, 815 F.2d at 840; *Leadertex*, 67 F.3d at 25. When

---

9. Although the Purchase Agreement is not within the scope of the Charter Party's arbitration clause, the Purchase Agreement provides that "in case of disputes, only the courts of Rome will be competent." *See* 9/30/02 Def. Letter at 3; Purchase Agreement, Ex. A to Compl., at 4. This forum selection clause is not raised by the present motion, but this Court may not be the proper forum for the non-arbitrable issues arising from the Purchase Agreement.

there is a combination of arbitrable and non-arbitrable issues, a court has discretion to stay the non-arbitrable issues pending arbitration. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 21 n. 23, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Genesco*, 815 F.2d at 856. Important factors to consider when determining whether the non-arbitrable issues should proceed include the predominance of the arbitrable claims, the merit of the non-arbitrable claims, the court's concern with controlling its own docket, and overall judicial economy. *See Moses*, 460 U.S. at 21 n. 23, 103 S.Ct. 927; *Genesco*, 815 F.2d at 856. When there are several arbitrable issues that are central to the overall matter and only one closely related non-arbitrable issue, it seems more reasonable for the court to stay the proceedings. On the other hand, if there is one small arbitrable issue that will not affect several non-arbitrable issues, a court could conclude that the proceedings should continue.

The non-arbitrable issues here are completely separate from F.D. Import's suit against the carriers. *First,* the claims against the suppliers are brought under the Purchase Agreement as opposed to the Bills of Lading and Charter Party. *Second,* the role of the fruit growers and suppliers is unrelated and distinct from that of the carriers who were responsible for the actual shipment of the fruit. *Finally,* court proceedings concerning the suit against the suppliers will not affect the outcome of the arbitration, or vice versa. Therefore, to reach an efficient resolution of these disputes, the non-arbitrable proceedings will continue in this Court. The first issue to be resolved in these proceedings is whether the forum selection clause of the Purchase Agreement binds the parties and requires the Court to dismiss the claims.

## VI. CONCLUSION

For the reasons stated above, I find that F.D. Import entered into a binding arbitration agreement with the following defendants: Reefer Sun, Arctic Reefers, Sapphire, OLSM, and South Pacific. Claims against these defendants are dismissed. The arbitration agreement does not govern claims brought against the following defendants: EBN, Pacific Fruit, Frutera, and Grupo Noboa. Defendants' motion to stay proceedings pending arbitration is denied and this action shall continue. A conference is scheduled for December 13, 2002, at 4:30 p.m.